**Joni J. WHEELER et al.**

v.

**Charles SHOEMAKER et al.**

**Civ. A. No. 76–0506.**

United States District Court,
D. Rhode Island.

March 3, 1978.

Milton Stanzler, Richard A. Skolnik, Lynette Labinger, Providence, R. I., for plaintiffs.

Kirk Hanson, Robert Parrillo, Thomas D. Gidley, Providence, R. I., for defendants.

## MEMORANDUM

PETTINE, Chief Judge.

Mr. and Mrs. Wheeler commenced this action in November of 1976 for injuries allegedly caused by the medical treatment provided Mrs. Wheeler by the defendants, Dr. Shoemaker and Newport Hospital in September, 1972. Because the plaintiffs are citizens of Washington state and defendants of Rhode Island, this Court has diversity jurisdiction over this action, 28 U.S.C. sec. 1332 (1970).

Both defendants have moved this Court to refer the action to a medical liability mediation panel, established by the Rhode Island Medical Malpractice Reform Act of 1976, R.I.G.L. §§ 10–19–1 et seq. (amended 1977) ("Act"). The panel operates essentially as an adjunct of the superior courts. All tort or contract actions for medical malpractice are filed initially in the appropriate superior court and immediately referred to the medical liability mediation panel. R.I. G.L. § 10–19–1.[1] The presiding justice of the superior court appoints to the panel a "special master" from a rotating panel of masters also appointed by the justice. He also selects an attorney from a list submitted by the state bar association. A physician selected at random from a list supplied by the state medical association completes the panel.

The panel reviews the merits of each malpractice claim by conducting a full-scale evidentiary hearing. The panel has the power to subpoena witnesses and appoint its own expert. The proceedings must be conducted in accordance with the rules of evidence and civil procedure that govern the superior court. R.I.G.L. § 10–19–5. Ultimately, the panel issues a written majority opinion stating the grounds for its conclusion, and, upon a finding of liability, the amount of damages. R.I.G.L. § 10–19–6, 7. If none of the parties rejects the panel's findings within thirty (30) days, the findings are deemed accepted. If any party files a timely rejection, the plaintiff may continue the action in superior court. R.I. G.L. § 10–19–9. At a subsequent trial, the panel's findings with regard to liability only, not damages, are admissible as evidence; any dissenting opinion is also admissible. The statute only explicitly provides

---

1. Although the initial enactment did not include claims against hospitals, the Act was amended in May of 1977 to include such claims. Defendant Newport Hospital argues that the amendment should be given retroactive effect. Because plaintiffs have agreed to reference of their claim against the Hospital, Plaintiffs' Memorandum at 15–16, the Court need not distinguish between the two defendants for purposes of this Opinion.

for trial examination of the experts relied upon by the panel, but makes no mention of examination of panel members themselves. R.I.G.L. § 10–19–8.

Generally, the state will defray the cost of the panel, including compensation for its members. R.I.G.L. § 10–19–1. However, if a party rejects the panel's findings or award without "a reasonable probability of success on the merits" in the subsequent trial or at least without a good faith belief in his ultimate success and if, in fact, the final judgment is no more favorable to the rejecting party, that party may be ordered to pay all costs, including attorney's fees and the expense of the panel. R.I.G.L. § 10–19–9.

The panel is only one of several reforms enacted in response to the well-known nationwide crisis in medical malpractice insurance.[2] By enacting the reform package, the drafters intended "to provide a comprehensive solution to the medical malpractice problem". Bill 76–H 7796 (as introduced), Explanation.

By their motion and related memoranda, defendants suggest that this Court, sitting in diversity, is required to refer the instant claim before trial to the medical liability mediation panel as established by the Act. The members of the panel would presumably be selected by the presiding justice of the superior court. In the alternative, they urge this Court to establish its own panel to pass on the claim. Defendants argue that either course is required by *Erie v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and *Bernhardt v. Polygraphic Co. of America*, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956).

Plaintiffs counter that to refer this case to a panel selected by the superior court judge defeats the purpose of diversity jurisdiction. With regard to defendants' second suggestion, plaintiffs characterize the reference to the panel as purely a state procedural matter that federal courts may ignore. Moreover, plaintiffs note that reference of every malpractice claim to a panel would be contrary to the very limited reference to a court-appointed master provided by Rule 53(b)[3] of the Federal Rules of Civil Procedure. By the terms of Rule 53(b), reference to a master shall be "the exception and not the rule"; in particular, reference to a master in a jury trial is permitted only when the issues are "complicated". When a federal and state rule of procedure conflict, plaintiffs argue that *Hanna v. Plumer*, 350 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) requires that the federal rule prevail.

For the reasons explicated herein, the Court agrees with plaintiffs that the federal court should not refer the instant claims to a panel, whether appointed by state or federal court.[4]

2. Along with the panel, the Rhode Island legislature established grievance procedures before a board of medical review, R.I.G.L. § 5–37.1–2–14, recertification procedures before a board of medical examiners, R.I.G.L. §§ 5–36–3.1, 37–2.-1, 37–4, a mechanism for reporting settlements and court judgments, R.I.G.L. §§ 42–14–2.1, 2.2, and disciplinary procedures against staff members by licensed hospitals. R.I.G.L. §§ 23–16–21, 22. In addition, in actions against a physician or health care facility, the legislature altered the statute of limitations, R.I.G.L. § 9–1–14.1, converted the issues of informed consent and *res ipsa loquitor* into preliminary questions of fact for the trial judge to pass upon, R.I.G.L. §§ 9–19–32, 33, and made admissible evidence of collateral benefits received by the plaintiff, R.I.G.L. § 9–19–34. Finally, the Act established a commission to study the effects of these reforms. P.L.1976, ch. 244 § 9.

3. Rule 53(b) reads in full:

A reference to a master shall be the exception and not the rule. In actions to be tried by a jury, a reference shall be made only when issues are complicated; in actions to be tried without a jury, save in matters of account and of difficult computation of damages, a reference shall be made only upon a showing that some exceptional condition requires it.

4. Because the central purpose of the legislation would be so clearly furthered by reference to a panel in federal court as well as state, the Court is hesitant to rely on a literal interpretation of the statute that in fact mentions only actions filed in superior court. This language only indicates that the legislature did not actually consider malpractice suits in federal court, not necessarily that the omission was deliberate. The federal court's refusal to refer to a panel, appointed by either federal or state court, to the extent that diversity jurisdiction is

## I. Reference to the Panel Appointed by the Superior Court

Defendants urge that, despite the federal court's jurisdiction over the instant action, this Court should initially refer all aspects of the claim to a panel appointed by the presiding justice of the superior court. If the panel was established as an administrative agency, akin to a workmen's compensation commission, the reference might be justified. *See e. g., Flotemersch v. Bedford County General Hospital*, 69 F.R.D. 556 (E.D.Tenn.1975). Instead, the panel was deliberately incorporated into the state trial system. The court concludes that reference to the panel so established amounts to little more than furnishing the state court an opportunity to pass upon the claim initially. To refer the action to a panel appointed by the state court, therefore, is contrary to the congressional grant of diversity jurisdiction.

Both the legislative history and the statutory scheme conclusively demonstrate that the Rhode Island legislature consciously intended the panel proceedings to function as an adjunct of the state court rather than as an independent agency. The panel lacks the traditional hallmark of an administrative agency—its members are appointed, not by the executive of the state, but by the presiding justice of the superior court. Consistent with his judicial appointment and his function as a judicial officer, one panel member is titled a "special master". Even the amendments to the original draft of the legislation reinforce the panel's role as part of the state trial system. The original draft required the claimant to file first with the panel before bringing the action in state court. If either party rejected the panel's findings, the litigant could "commence" the action in superior court by filing, Bill 76–H 7796 § 10–19–9. The bill as enacted requires the claimant to file the action first in superior court, R.I.G.L. § 10–19–2. If either party rejects the findings, the litigant may "continue" his action in superior court, R.I.G.L. § 10–19–9.

available, will defeat the statutory objectives. Thus, based on the purposes of the statute rather than the literal language, the Court assumes that the legislature intended the panel provision to apply to federal diversity actions.

In both appointment and procedure, the Rhode Island scheme differs significantly from that before the federal district court in *Flotemersch v. Bedford County General Hospital*, 69 F.R.D. 556 (E.D.Tenn.1975), the only decision defendants offer in direct support of panel reference. The *Flotemersch* court held that plaintiff had not pleaded a condition precedent to suit, namely that she had complied with the review provisions of the Tennessee Medical Malpractice Review Board and Claims Act of 1975, Public Acts of Tennessee of 1975, Chapt. 299. That statute required that: "No medical malpractice action shall be filed in any court within this State unless the plaintiff in such action shall have complied" with the provisions for panel review. *Id.* at sec. 3(b). The Tennessee panel was established as an independent agency appointed by the governor of the state. Based on the statutory language, the court characterized the review provisions as reasonable and appropriate "conditions precedent" to suit and required plaintiff to comply. 69 F.R.D. at 228. *See Markham v. City of Newport News*, 292 F.2d 711, 714 (4th Cir. 1961). Because the Rhode Island panel is appointed by the state court and incorporated into its proceedings, characterization of the instant review provisions as a condition precedent to suit is inapposite.

Nor is analogy to a workmen's compensation commission, a body charged with initial review of all compensation act claims, appropriate. Unlike workmen's compensation, the Malpractice Reform Act does not merge the common law cause of action into a statutory malpractice action. The legislature preserved all the elements of and defenses against the common law malpractice action, including trial by a common law court; it merely altered the initial format of the trial. In fact, the Rhode Island Malpractice Commission ("Commission")

*See* H. Hart & A. Sachs, The Legal Process 1179 (Tent. ed. 1958). The question remains whether this Court should refer the instant action to a panel.

who studied and drafted the original bill, specifically rejected for the present the alternative of a compensation panel, akin to a workmen's compensation commission. Final Report at 84–85 (April, 1976) ("Report").[5]

■ Since the malpractice panel is essentially an adjunct of state court, it follows that reference to the panel appointed by the state court is tantamount to vesting original jurisdiction in state court and would defeat the purpose of the congressional grant of diversity jurisdiction. Diversity jurisdiction was designed primarily to give out-of-state suitors the option of an impartial forum, free from any bias local courts might exercise in favor of in-state parties. *See Bank of United States v. Deveaux*, 5 Cranch 61, 87, 3 L.Ed. 38 (U.S.1809); *Martin v. Hunter's Lessee*, 1 Wheat 304, 347, 4 L.Ed. 97 (U.S.1816); *Miller v. Davis*, 507 F.2d 308 (6th Cir. 1974); Federalist No. 80 (Hamilton).[6] Even in the most extreme pronouncement of the *Erie* doctrine, *Guaranty Trust Co. of New York v. York*, 326 U.S. 99, 111–12, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), federal diversity jurisdiction was still valued as an alternate tribunal for the out-of-state litigant, although the federal court no longer applied an alternate body of substantive law. *See* Ely, The Irrepressible Myth of *Erie*, 87 Harv.L.Rev. 693, 713 (1974).

■ This jurisdiction has been jealously guarded against efforts by state legislatures to limit enforcement of state-created causes of action to state tribunals, *Chicago & Northwestern Railway Co. v. Whitton's Administrator*, 13 Wall 270, 286, 20 L.Ed. 571, 576 (1871). *See Hayes Industries Inc. v. Caribbean Sales Associates*, 387 F.2d 498, 500 (1st Cir. 1968); *Merritt-Chapman & Scott Corp. v. Pennsylvania Turnpike Commission*, 387 F.2d 768 (3d Cir. 1967); *Markham v. City of Newport News*, 292 F.2d 711 (4th Cir. 1961); *First National City Bank v. Gonzalez & Co. Sucr. Corp.*, 308 F.Supp. 596 (D.P.R.1970); *Rubel-Jones Agency, Inc. v. Jones*, 165 F.Supp. 652 (W.D.Mo.1958). *Cf. Meredith v. Winter Haven*, 320 U.S. 228, 234, 64 S.Ct. 7, 88 L.Ed. 9 (1943); *Barry v. St. Paul Fire & Marine Insurance Co.*, 555 F.2d 3, 13 (1st Cir. 1977), *cert. granted* 434 U.S. 919, 98 S.Ct. 391, 54 L.Ed.2d 275 (1977); *Poitra v. Demarrias*, 502 F.2d 23, *cert. denied* 421 U.S. 934, 95 S.Ct. 1664, 44 L.Ed.2d 93 (8th Cir. 1974).

The statute at bar denies the federal court initial jurisdiction. The first trial of the action for all practical purposes occurs before a state tribunal according to state rules of evidence and procedure. With respect to both settlement and the subsequent jury verdict, the hearing before the panel is likely to be the decisive battle between the litigants. After all the evidence has been initially weighed by the panel, the parties are likely to accept the liability and damages determinations of the panel to avoid the additional cost and uncertainty of a subsequent trial. Report at 107, 108. Even at subsequent trial, the panel determinations, admitted as evidence, are likely to influence, if not determine, the jury verdict. *Id.* at 108. The danger of local bias against the out-of-state plaintiff at the crucial panel proceedings is particularly real when the reviewing panel is not composed of judges

---

**5.** That alternative required more study, the Commission concluded, because of potential constitutional problems. Report at 85. Workmen's compensation schemes have been held consistent with the right to jury trial at common law if the legislature merged the common law action into the statutory, if the employee can elect to preserve his common law right of action or if the employee has a right to trial de novo before a jury. L. Jaffe, Judicial Control of Administrative Action 98 (1965). The Rhode Island Workmen's Compensation Act, for example, R.I.G.L. § 28–29–17 (1969 Reenactment) permits the employee to opt out of the compen-

sation scheme and preserve his common law cause of action. *See, e. g., Prendergast v. Nelson*, 199 Neb. 97, 256 N.W.2d 657 (1977) (malpractice panel scheme providing for patient's election upheld).

**6.** Admittedly, the contemporary reality of the underlying assumption of local prejudice and the utility of diversity jurisdiction in general have been increasingly questioned, *see generally* P. Bator, P. Mishkin, D. Shapiro & H. Weschler, Hart & Weschler's The Federal Courts and the Federal System at 1053–59 (2d ed. 1973).

who are selected for, sworn to and practiced in impartiality.

In sum, the Court concludes that the congressional grant of diversity jurisdiction prohibits any reference to a state-appointed panel. The question remains: must the federal court appoint its own panel to which the court must initially refer all malpractice actions filed in federal court that arise under Rhode Island law?

## II. Reference to a Panel Appointed by the Federal Court

Defendants also argue that this Court, in obedience to the dictates of the Rules of Decision Act, 28 U.S.C. § 1652 (1970),[7] as interpreted in *Erie v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), must establish a reference procedure mimicking the state court's but staffed by appointment of the federal court. For support, defendants analogize the panel proceeding to arbitration and cite decisions that look to state law with regard to enforcement of arbitration agreements between parties of diverse citizenship in federal court. *Bernhardt v. Polygraphic Co. of America*, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956), *Lummus Co. v. Commonwealth Oil Refining Co.*, 195 F.Supp. 47 (S.D.N.Y.1961).[8]

Plaintiffs counter that the Rules of Decision Act and *Erie* are inapplicable when the state rule is procedural and when a federal rule of civil procedure is in direct conflict with the state rule. In such an event, plaintiffs contend that the Supreme Court's decision in *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1126, 14 L.Ed.2d 8 (1965), requires adherence to the federal rule. The lynchpin of plaintiffs' argument is that a direct conflict between the federal and state rules does in fact exist. Plaintiffs identify the conflict as between the state rule's requirement that the court refer all medical mal-

practice claims to the panel and Federal Rule 53(b)'s requirement that reference to a master appointed by the court is only appropriate in "exceptional" circumstances which, in the jury trial context, are limited to reference of "complicated" issues.

■ The difference plaintiffs point to is indeed substantial, but does not state a conflict because Rule 53 cannot be fairly interpreted to cover panel proceedings of the type established by the state rule. Although both the panel members and the master are court-appointed and both their findings are admissible as evidence at a subsequent jury trial, the panel is intended to function as a mandatory preliminary forum of adjudication as compared to the master who merely assists the jury with respect to a very limited area of dispute in a very limited number of cases. For example, the panel passes on all issues—liability and damages—in every malpractice case; typically, in a jury trial, the master will review only complicated accounts for damages and not liability issues, no matter how complex. *Tights, Inc. v. Stanley*, 441 F.2d 336 (4th Cir. 1971); *Radical Lip Machine, Inc. v. International Carbide Corporation*, 76 F.R.D. 224 (N.D.Ill.1977). In addition, unless rejected, the panel's findings constitute a judgment against the losing party. In contrast, although the parties may settle after the master issues his findings, the findings themselves never constitute a final judgment. *Compare Comiskey v. Arlen*, 55 A.D.2d 304, 390 N.Y.S.2d 122 (Sup.Ct.1976) *with Wright v. Central DuPage Hospital Assoc.*, 63 Ill.2d 313, 347 N.E.2d 736 (1976). Furthermore, the fact that the state generally defrays the costs of the panel indicates that the Rhode Island panel is an established forum of initial adjudication; by comparison, the parties must bear the cost of the master's expenses. From these factors and statements of intent by the Com-

---

7. The Rules of Decision Act reads:

    The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply.

8. Defendants rely on these courts' premise that the initial forum of decision, be it arbitration or a panel, may indeed affect the outcome of the case. However, as discussed *infra*, the outcome-determinative test is no longer the sole appropriate measure under the Rules of Decision Act.

mission which proposed the panel, it is clear that the primary purpose of reference to the panel is to avoid jury trial, Report at 107, or, if trial is nonetheless pursued, to displace the jury's independent evaluation, Report at 108. The master's primary purpose—to assist the jury to reach a "more intelligent" decision, *In re Peterson*, 253 U.S. 300, 307, 40 S.Ct. 543, 64 L.Ed. 919 (1920),—is only an incidental effect of panel review. In short, despite similarities, the panel and the master are simply two different animals.

As a consequence of the Court's conclusion that Rule 53 does not cover panel proceedings, the apparent holding of *Hanna* that a federal rule prevails in a conflict between state and federal procedural rules, is inapplicable. Even assuming the holding in *Hanna* mandated automatic obedience to the federal rule, *but see Marshall v. Mulrenin*, 508 F.2d 39 (1st Cir. 1974); *Ely, supra*, at 718–38, the *Hanna* holding is premised on the existence of a direct conflict between the state and federal rules. Indeed, the Hanna Court distinguished several prior decisions that followed the state rule on the ground that, in those cases, no federal rule covered the subject matter controlled by the state rule, and, thus, no conflict existed. *Hanna v. Plumer*, 380 U.S. at 470, 85 S.Ct. 1136.

In the absence of a controlling federal rule, the Rules of Decision Act and the evolving *Erie* doctrine govern whether this Court must follow the state reference procedure by appointing its own panel to initially review the instant action. At the outset, the Court notes that this is a case of first impression; malpractice screening panels are still a young experiment. *See generally,* Redish, Legislative Response to the Medical Malpractice Insurance Crisis: Constitutional Implications, 55 Tex.L.Rev. 759 (1977); Comment, An Analysis of State Legislative Responses to the Medical Malpractice Crisis, 1975 Duke L.J. 1417. In this case, the *Erie* determination is difficult both with regard to identifying the appropriate legal criteria and deciding between competing and weighty federal and state interests.

Most recently in dictum in *Hanna*, the Supreme Court identified twin concerns of the *Erie* Court—deterrence of forum-shopping and of the resulting inequitable administration of justice—as the key criteria to govern whether, in the absence of a controlling federal rule, a federal court must follow a state rule pursuant to the Rules of Decision Act. The Court did not indicate whether these criteria were intended as the exclusive measure or whether other strong federal and state interests, when present, should also be factored in. The latter balancing approach was adopted by the Supreme Court in *Byrd v. Blue Ridge Rural Electric Cooperative, Inc.*, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958) only several years prior to *Hanna*, as a substitute for the outcome-determinative test formulated in *Guaranty Trust Co. v. York*, 326 U.S. at 109, 65 S.Ct. 1464, that had proved too deferential to state law. The *Hanna* Court cited with approval *Byrd*'s death-knell for the strict application of the outcome-determinative test, 380 U.S. at 467, 85 S.Ct. 1136, but neither overruled not explicitly endorsed the *Byrd* balance of state and federal interests. *See* Redish & Phillips, Erie and the Rules of Decision Act; In Search of the Appropriate Dilemma, 91 Harv.L.Rev. 356, 367–72 (1977) (*Byrd* test still valid); *contra* Ely, *supra*, at 717 n.130 (*Byrd* displaced by *Hanna* ).

In *Byrd*, the Supreme Court decided in favor of the federal practice of submitting to the jury rather than the judge the question of whether defendant was plaintiff's employer under the state's workmen's compensation law, despite the state practice to the contrary. Only a superficial examination of the state's interest satisfied the Court that the state practice was not "bound up" with the state substantive law. The Court identified "affirmative countervailing considerations":

> The federal system is an independent system for administering justice to litigants who properly invoke its jurisdiction. An essential characteristic of that system is the manner in which, in civil common-law

actions, it distributes trial functions between judge and jury and, under the influence—if not the command—of the Seventh Amendment, assigns the decisions of disputed questions of fact to the jury. *Jacob v. City of New York*, 315 U.S. 752, 62 S.Ct. 854, 86 L.Ed. 1166. The policy of uniform enforcement of state-created rights and obligations, see, e. g., *Guaranty Trust Co. of New York v. York,* supra, cannot in every case exact compliance with a state rule—not bound up with rights and obligations—which disrupts the federal system of allocating functions between judge and jury. *Herron v. Southern Pacific Co.*, 283 U.S. 91, 51 S.Ct. 383, 75 L.Ed. 857. Thus the inquiry here is whether the federal policy favoring jury decisions of disputed fact questions should yield to the state rule in the interest of furthering the objective that the litigation should not come out one way in the federal court and another way in the state court. 356 U.S. 537–38 [footnotes omitted].[9]

The federal interest in preserving the jury's role was sufficient to overcome any existing state interest and the interest in preventing divergent outcomes in state and federal forums.[10]

■ At least when the state rule would significantly alter the role of the jury in the federal system, the *Byrd* balancing approach is applicable. For example, citing *Byrd* as authority, the First Circuit followed the federal jury size of six rather than the state's twelve, *Wilson v. Nooter, Co.,* 475 F.2d 497, 503–04 (1st Cir. 1973), *cert. denied*, 414 U.S. 865, 94 S.Ct. 116, 38 L.Ed.2d 85 (1973), *see Colgrove v. Battin,* 413 U.S. 149, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973); the Second Circuit applied the federal rule of remittur of a jury award of damages, *Karlson v. 305 East 43rd St. Corp.*, 370 F.2d 467, 472 n.1 (2d Cir.); *cert. denied,* 387 U.S. 905, 87 S.Ct. 1690, 18 L.Ed.2d 625 (1967), and the First Circuit, joined by several other Circuits, followed the federal rule of sufficiency of the evidence to go to the jury, *Molinar v. Western Electric Co.,* 525 F.2d 521, 527 (1st Cir. 1975); *cert. denied,* 424 U.S. 978, 96 S.Ct. 1485, 47 L.Ed.2d 748 (1976); *Cowger v. Arnold,* 460 F.2d 219 (3d Cir. 1972); *Wratchford v. S. J. Groves & ·Sons Co.,* 405 F.2d 1061 (4th Cir. 1969).[11] Whether to follow the state panel procedure easily falls within this category of decisions affecting the role of the jury in the federal system, decisions to which the *Byrd* balancing approach surely applies. Rhode Island has adopted the panel reference in response to growing frustration with high jury verdicts and settlement of unmeritorious suits under the threat of such verdicts. Panel reference is intended to and will, in fact, strongly influ-

**9.** *Byrd* can be fairly interpreted to permit consideration of the countervailing federal interest only when the state interest is not "bound up" with the state substantive law. The interpretation this Court prefers is that *Byrd* counsels a balancing of the federal interest even if a significant state interest is "bound up" with the state statute. *Accord* Redish & Phillips, *supra,* 91 Harv.L.Rev. at 365. Provided that the state rule is not substantive law that controls "primary private activities", *Hanna v. Plumer,* 380 U.S. at 475, 85 S.Ct. 1136 (Harlan, J. concurring), there is no reason to completely ignore the federal interest. However, the significance of the state interest will, of course, be magnified in the case of a state rule that furthers (or is "bound up" with) state substantive law.

**10.** Although the Court acknowledged the possibility of differing outcomes depending on whether a judge or jury decided the issue, the effect on outcome was not as predictably in favor of one party as a rule, like a statute of

limitations, that by its very terms bars recovery.

**11.** *See McDonald v. United Airlines, Inc.,* 365 F.2d 593 (10th Cir. 1966); *Baron Tube Co. v. Transport Ins. Co.,* 365 F.2d 858, 862 (5th Cir. 1966) (en banc), *overruling Johnson v. Colglazier,* 348 F.2d 420 (5th Cir. 1965) (counsel's arguments to the jury). *Cf., Miller v. Davis,* 507 F.2d 308 (6th Cir. 1974); *Poitra v. DeMarrias,* 502 F.2d 23, *cert. denied,* 421 U.S. 934, 95 S.Ct. 1664, 44 L.Ed.2d 93 (8th Cir. 1974); *Lynne Carol Fashions, Inc. v. Cranston Print Works Co., Inc.,* 453 F.2d 1177 (3d Cir. 1972); *Atkins v. Schmutz Manufacturing Co.,* 435 F.2d 527 (4th Cir. 1970), *cert. denied,* 402 U.S. 932, 91 S.Ct. 1526, 28 L.Ed.2d 867 (1971); *Szantay v. Beech Aircraft Corp.,* 349 F.2d 60 (4th Cir. 1965); *Willis v. Fournier,* 418 F.Supp. 265 (M.D.Ga.1976) (cases extending *Byrd* approach to issues of access to federal courts).

ence the jury verdict or circumvent jury trial altogether.

Not only does *Byrd* furnish the appropriate methodology, that decision and the cases cited above that have relied on it, suggest that the federal interest in preservation of the role of the jury is of the highest order. The Fourth Circuit explained that the federal standard of sufficiency of evidence should control because:

[f]aith in the ability of a jury, selected from a cross-section of the community, to choose wisely among competing rational inferences in the resolution of factual questions lies at the heart of the federal judicial system. That faith requires consistency within the system and does not permit the accommodation of more restrictive state laws. *Wratchford v. S. J. Groves & Sons Co.,* 405 F.2d at 1065.

At bottom, the Rhode Island legislature has enacted the panel reference procedure because of a lack of "faith" in the jury's ability to fairly decide liability and damages. The proceedings before the panel are designed to imitate a trial in every respect with one crucial exception—a panel including a doctor and a lawyer, rather than a lay jury, passes on whether the defendant doctor exercised due care.

■ Although the interference with the jury's role may not be of constitutional magnitude,[12] *see, e. g., Prendergast v. Nelson,* 199 Neb. 97, 256 N.W.2d 657 (1977); *Carter v. Sparkman,* 335 So.2d 802 (Fla. 1976), *cert. denied* 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753 (1977); *Comiskey v. Arlen,* 55 A.D.2d 304, 390 N.Y.S.2d 122 (Sup.Ct.1976); *Halpern v. Gozan,* 85 Misc.2d 753, 381 N.Y.S.2d 744 (Sup.Ct.1976); *Simon v. St. Elizabeth's Medical Center,* 3 Ohio Op.3d 164, 355 N.E.2d 903 (Com.Pl.1976); *Contra Wright v. Central DuPage Hospital Assoc.,* 63 Ill.2d 313, 347 N.E.2d 736 (1976), (all state constitutional decisions); *see generally* Roth, The Medical Malpractice Insurance Crisis, 44 Ins. Counsel J. 469 (July, 1977); Lenore, Mandatory Medical Malpractice Mediation Panel, 44 Ins. Counsel J. (July, 1977); Note, Medical Malpractice Statute—Medical Malpractice Statute Declared Unconstitutional, 77 Wisc. 203 (1977), most juries are not likely to conduct an independent evaluation of the evidence and conclude contrary to a court-appointed panel of esteemed professionals who have reviewed all the evidence. Report at 108. *See Boyd Callan, Inc. v. United States,* 328 F.2d 505, 507 (5th Cir. 1964). Similar conclusions and concerns about interference with the jury's role informs, for example, Rule 53(b)'s restrictions on the use of masters in jury trials. In *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), the Supreme Court noted that the power to appoint a master under Rule 53(b) to assist the jury on complicated issues is "a limited inroad upon the right to trial by jury [that] 'should seldom be made, and if at all, only when unusual circumstances exist.' " *Id.* at n.18, *quoting La Buy v. Howes Leather Co.,* 352 U.S. 249, 258, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957).[13]  Yet, the panel will

12. Plaintiffs have not raised the question of whether the seventh amendment forbids use of panels. Although not applicable to state courts, the seventh amendment has full force and effect in diversity actions in federal court, *Simler v. Conner,* 372 U.S. 221, 83 S.Ct. 609, 9 L.Ed.2d 691 (1963) (per curiam). The federal interest in the jury's role is not necessarily coterminous with the seventh amendment guarantee, *see Byrd, supra,* 356 U.S. at 537, 78 S.Ct. 893. Thus, the decision of the seventh amendment question, neither raised nor briefed by the parties, need not be reached today.

13. The requirement of Rule 53(b) that only complicated issues can be referred to the master reflects the central distinction in the seventh amendment that the right to jury trial exists only in actions at law and not in equity. An action for money damages calls for the equitable remedy of accounting only when "the accounts between the parties are of such a 'complicated nature' that only a court of equity can satisfactorily unravel them". *Dairy Queen,* 369 U.S. at 478, 82 S.Ct. 894, 900. *Accord* Wright & Miller, Federal Practice and Procedure, Civil sec. 2604. Thus, the constitutional validity of the use of masters in jury trials, *In re Peterson,* 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919 (1920), may be limited to reference of the complicated items of accounting, such as those actually involved in *Peterson,* for the sole purpose of promoting "more intelligent consideration" by the jury. *Id.* at 307, 40 S.Ct. 543. *Cf. Tights, Inc. v. Stanley,* 441 F.2d 336 (4th Cir. 1971); *In re Watkins,* 271 F.2d 771 (5th Cir.

pass on *all* questions of defendants' deviation from the duty of professional care, regardless of the complexity of the issues or the utility of expert knowledge. Such issues constitute the archtypical questions of common law liability that a jury is traditionally competent to consider. *Cf. Curtis v. Loether*, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974); *Ross v. Bernhard*, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970). Admittedly, contemporary skepticism about the jury's ability to comprehend technical issues of liability commonly circulates. However, until clear direction from Congress to the contrary, common law liability questions must be considered within the jury's competence in the federal system, *see* Sanders, Varieties of Dispute Processing, 70 F.R.D. 111, 132–33 (1976).[14]

◼ The state interests which the panel procedure serves are by no means trivial nor merely procedural. Like pretrial conferences and motions, the panel provision is designed to eliminate frivolous claims and encourage settlement. Report at 97. However, in the particular context of the medical malpractice crisis, even these procedural goals serve broader substantive purposes. Smooth operation of the health care system in many states has been jeopardized by doctors' strikes over high malpractice insurance rates. To stabilize health care management and insurance rates, Rhode Island has modified the adjudication process to favor defendants.[15] Indeed, the stated purposes of review by the panel are to "protect providers of medical care", "reduce the number and dollar amount of judgments and settlements" and "encourage reestablishment of an orderly, competitive, malpractice insurance market" in Rhode Island. Report at 97–98. Thus, if the panel, which includes one member of defendants' profession, functions as intended, the tally of panel verdicts will be lopsided in defendants' favor.[16] Like allocation of burden of proof, *see Palmer v. Hoffman*, 318 U.S. 109, 117, 63 S.Ct. 477, 87 L.Ed. 645 (1943) (state burden of proof governs), the non-neutral panel procedure redistributes the risks of litigation. To the extent that diversity jurisdiction is available, the state's objectives are frustrated by the federal court's refusal to establish its own panel.

Moreover, the federal court's refusal is likely to encourage the very evils—forum-shopping and inequitable administration of justice—a federal court should avoid, ab-

1959) (lower courts abused discretion in referring insufficiently complicated issues to master). *See also Boyd Callan, Inc. v. United States*, 328 F.2d 505 (5th Cir. 1964).

**14.** In addition to masters, Congress has provided that the court may appoint its own expert witness in jury trials, Rule 706(a), Federal Rules of Evidence. Despite the "aura of infallibility", Advisory Committee Notes, the promulgators concluded that such non-partisan expert testimony would more assist jury deliberations than prejudice them. However, this Rule does not constitute congressional authorization for a court-appointed panel. Only one member of the panel, the physician, could be classified as an expert in medical practice. *Compare* R.I. G.L. § 9–17–9 (1972) (provides specifically for appointment of impartial expert). More importantly, the panel does not function like a witness. The Rhode Island statute specifically provides only for examination in court of experts relied upon by the panel; it does not provide for panel members to appear as witnesses. Moreover, unlike the panel, the expert witness provided for in Rule 706 does not review all the evidence in a trial-like proceeding and does not make formal findings of fact, conclusions of law, or award damages. The court-appointed expert's function is solely to furnish impartial testimony and opinion respecting his particular area of expertise to assist the jury's evaluation of the partisan experts. The panel will review *all* claims regardless of the need for expertise, impartial or otherwise, to determine liability. *See e. g., Wilkinson v. Vesey*, 110 R.I. 606, 295 A.2d 678 (1972) (no need for expert testimony with regard to claim based on informed consent).

**15.** *Cf., e.g., Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) (state law bond requirement for minority shareholder's suit controls), *as interpreted in Hanna v. Plumer*, 380 U.S. at 477–78, 85 S.Ct. 1136 (Harlan, J., concurring); *Ely, supra* at 729 (both Mr. Justice Harlan and Professor Ely suggest *Cohen* involved substantive goals of protecting state-created corporations from strike suits).

**16.** *Cf.* Broeder, Occupational Expertise and Bias as Affecting Jury Behaviour: A Preliminary Look, 40 N.Y.U.L.Rev. 1079 (1965) (a study demonstrating that a juror's verdict is influenced by the juror's occupation).

228

sent strong, countervailing considerations. Because the odds of success are worse for plaintiffs before the panel, plaintiffs will be more likely to select a federal forum without a panel than a state forum with a panel. In addition, in-state defendants will face considerably greater risks of adverse settlements and jury verdicts upon suit by out-of-state plaintiffs in federal court than their colleagues subject to suit by in-state plaintiffs in state court. As a consequence of the federal court's failure to refer to a panel, doctors and health centers with a regional or national clientele who are more likely to face suit in federal court may pay higher insurance rates. *Cf.* Symposium, The 1975 Indiana Medical Malpractice Act —Introduction: The Indiana Act in Context, 51 Ind.L.J. 91, 93 (1975).

The unfairness, however, is a two-way street. Although failure to establish a panel procedure in federal court will result in the inequitable administration of justice towards defendants, adherence to the panel procedure will result, at the very least, in the appearance of unfairness to plaintiffs—an evil the federal system also must avoid. Preliminary decision by a non-neutral tribunal, a decision which is admissible at a later trial, will undermine the confidence and respect for judgments obtained in federal court. *See also* Note, Master and Magistrates in the Federal Courts, 88 Harv.L.Rev. 779, 789–96 (1975). Surely, in addition to preserving the role of the jury, the federal judiciary has a legitimate and important interest in the fairness of the process.

If this was a typical *Erie* case that required a federal court to simply apply a state rule of procedure without the necessity of increasing personnel and appropriations, the Court would be hard pressed indeed to choose between, on the one hand, the significant state interests, especially in light of the harm that will result from the federal court's failure to honor those interests, and, on the other hand, the federal interest in preserving the essential features and fairness of its system. However, to adhere to the state rule in the instant case, an act truly different in both kind and degree from the typical *Erie* case is called for by defendants' suggestion that this Court appoint its own panel in accordance with state law.[17] The burdens placed on the federal judiciary as a result convince the Court that it need not appoint a panel.[18] New appropriations, for both the extra cost of administering the panel process and the salaries of the panel members themselves, would be necessary. If the costs of the panel procedure were not shouldered by the federal government but placed on the litigants,[19] forum-shopping would operate in reverse; litigants would always shun federal court in favor of state court where the state government generally defrays the cost. To avoid this deterrent effect, the federal government would have to absorb the cost of the panel.[20] However, the state legislature cannot unilaterally thrust the substantial, added inconvenience and cost onto the federal system. The federal government has a significant interest in controlling the administrative burdens imposed on its judiciary and the expansion of its staff and budget. *See Wilson v. Nooter*, 475 F.2d at 504 (cognizable federal interest in avoiding the added inconvenience and

17. Even reference to an arbitration panel demands only that the court specifically enforce the parties' agreement. *Lummus Co. v. Commonwealth Oil Refining Co.*, 195 F.Supp. 47, at 51–54. The parties usually arrange both for the selection of an arbitrator and his compensation.

18. Although Professor Redish and Mr. Phillips ultimately conclude that a federal court should follow a state's malpractice screening panel procedure, the authors also note that both state and federal interests are evenly balanced. *Supra*, 91 Harv.L.Rev. at 399–400. The authors accord great weight to the federal interest in controlling its cost and inconvenience; however, the establishment of the panel in the instant case imposes even heavier burdens than the authors had anticipated, *id.* at n.229, and these unanticipated burdens justify a decision contrary to the authors' suggestion to follow the state procedure.

19. *E. g.,* Rule 53(a), Federal Rules of Civil Procedure (cost of master imposed on litigants).

20. *E. g.,* Rule 706(b), Federal Rules of Evidence (specifically provides for the federal government to defray the cost of a court-appointed witness).

cost of extra jurors if state's twelve man jury rather than the federal jury of six were followed). Nor can this Court, absent more specific intent than the present language of the Act indicates, thrust the cost of a federally-appointed panel upon the state legislature.

The cost to the judicial system and to the litigants cannot be minimized. *See* Comment, Recent Medical Malpractice Legislation—A First Checkup, 50 Tul.L.Rev. 655, 681 (1976). Rather than judicial economy, in fact, three tribunals—the panel, the reviewing trial judge[21] and the jury—will often pass on liability. The federal judiciary has a substantial interest in avoiding the multiplicity of the already staggering delay and cost to litigants and to the administration of the federal courts. *See also La Buy v. Howes Leather Co.*, 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957) (same concerns with respect to overuse of masters). Lastly, to establish a panel only for malpractice actions arising in Rhode Island, while all other diversity and federal malpractice actions travel the same jury trial route, destroys uniformity of federal practice, *see Wilson v. Nooter*, 475 F.2d at 504, and significantly complicates the administration of the courts.

In conclusion, this Court chooses to honor the federal interests in controlling both the character, quality and cost of the adjudicatory process in federal court. This decision is admittedly at the expense of significant state interests in reforming malpractice litigation and federalism interests in avoiding divergent outcomes in state and federal courts. However, *Erie* principally directs the federal court to apply the state's *substantive* law, absent a congressional statute enacted pursuant to an enumerated power that displaces that law. Consistent with the grant of diversity jurisdiction, the federal forum continues to offer the citizen of diverse citizenship an alternate body of practice and procedure, *see Guaranty Trust Co. v. York*, 326 U.S. 99, 111–12, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *Ely, supra*, at 713; *see also* Hart & Wechsler, The Federal Courts and the Federal System, at 652 (1st ed. 1953) ("juster justice" of federal court permissible). To defer to the federal system's jurisprudential, administrative and financial interests in the federal adjudicatory process does not do violence to the core principles of *Erie*. Although the open-ended balancing approach of *Byrd* may result in too much uncertainty to make the approach appropriate for a majority of *Erie* problems, when both the state and federal interests have the degree of importance that is involved in this case, a federal court must fully consider and balance both. The *Hanna* touchstones of forum-shopping and inequitable administration of justice have the virtue of certainty but fail to adequately address the more significant concerns of both the state and federal systems at stake in this case.

An order will be prepared accordingly.

---

**21.** Although the Rhode Island procedure does not call for judicial review of objections to the panel findings before they are admissible, a federal court might wisely choose, or indeed be compelled, to review the parties' objections. *E. g.*, Rule 53(e), Federal Rules of Civil Procedure (judicial review of parties' objections to master's findings). *See La Buy v. Howes Leather Co.*, 352 U.S. 249, 256, 97 S.Ct. 309, 1 L.Ed.2d 290 (1957). As a consequence, frequently in a negligence malpractice action, mixed questions of law and fact central to every determination of liability by the panel will be subject to close scrutiny by the trial judge. *Cf. Eastern Fireproofing Co., Inc. v. United States Gypsum Co.*, 50 F.R.D. 140 (D.Mass.1970).